## Maggard et al. v. Commonwealth.

Oct. 17, 1941.

Wm. Lewis & Son for appellants.

Hubert Meredith, Attorney General, and Guy H. Herdman, Assistant Attorney General, for appellee.

OPINION OF THE COURT BY JUDGE FULTON—Affirming.

The appellants, James Maggard, Russell Maggard, Henry Clay Lewis, A. C. Howard, Bentley Fields and Roy Fields, were convicted for the crime of confederating and banding together to intimidate and alarm Pit Nicholson in violation of Section 1241a-1, Kentucky Statutes and bring this appeal, the first ground for reversal urged being that the indictment was insufficient.

In what has many times been referred to by this court as the accusatory part of the indictment the appellants were charged with the crime of "confederating and banding together to intimidate and alarm" without specifying that such confederating and banding together was to intimidate and alarm some person or another. In that part of the indictment many times referred to in the opinions of this court as the descriptive part it is alleged that the appellants confederated and banded themselves together *and went forth armed* for the purpose of intimidating and alarming Pit Nicholson and did

in pursuance of the conspiracy confederate and band themselves together and go to the home of Nicholson and intimidate and alarm him by cursing, swearing and threatening and by being drunk and armed with deadly weapons. It is argued that the failure of the so-called accusatory part of the indictment to allege that the appellants confederated and banded together to intimidate a person does not directly and certainly name the offense charged as required by Section 124 of the Criminal Code. As sustaining this argument the cases of Grise et al. v. Commonwealth, 245 Ky. 220, 53 S. W. (2d) 362; Deaton and Boggs v. Commonwealth, 220 Ky. 343, 295 S. W. 167 and Miller v. Commonwealth, 248 Ky. 717, 59 S. W. (2d) 969 are mainly relied on. In the two former cases the so-called accusatory part of the indictment merely charged confederating and banding together and stopped. The indictments were held insufficient because there could be a confederating and banding together for a lawful purpose. In the latter case the so-called accusatory part was under Section 1241a-1 but the descriptive part of the indictment charged an offense under Section 1186 and it was held that the accusatory and descriptive parts of the indictment must apply to the same offense. In the instant case, however, the crime named in the preliminary part of the indictment is confederating and banding together to intimidate and alarm. It is not to be assumed or imagined that the Legislature in enacting Section 1241a-1 had in mind the intimidation, alarming or disturbing of anything but persons. To hold otherwise would amount to an assumption that the Legislature was engaging in an absurdity in the enactment of the statute. Even if the rule followed in the Grise and Deaton and Boggs cases were the true and correct rule, we think the crime with which the appellants were charged was stated with sufficient directness and certainty to satisfy the code provision. It seems that the practice of referring to the "accusatory" and "descriptive" parts of an indictment is somewhat of an anomaly in Kentucky. See note to Section 189 on page 669 of 31 C. J. An indictment is generally referred to as consisting of three principal features, 1) the caption, 2) the charge and 3) the conclusion. 27 A. J. 608 and sometimes a fourth principal feature is enumerated, namely, the commencement, this being the part of the indictment preceding the statement of the offense and showing the county for which the grand jury

is acting and that they present the indictment upon oath. See 31 C. J. 601. The custom of referring to the accusatory and descriptive parts of the indictment and considering them as separate and distinct entities has probably resulted in numerous cases holding that the indictment was not sufficiently direct and certain as regards the offense charged by reason of the fact that the court considered only what it called the accusatory part in determining this question. We think the correct rule was stated in Overstreet v. Commonwealth, 147 Ky. 471, 144 S. W. 751, 753, wherein the court said:

> "In considering the sufficiency of an indictment, it will be read and considered as a whole; and if, when so read and considered, it substantially conforms to the rules of the Code in respect to the matters therein pointed out as material and necessary, it will be a good indictment."

This case was followed in Drury v. Commonwealth, 162 Ky. 123, 172 S. W. 94 and in Smith v. Commonwealth, 284 Ky. 80, 143 S. W. (2d) 859 and cited with approval in Tackett v. Commonwealth, 285 Ky. 83, 146 S. W. (2d) 937. When the indictment in the instant case is considered as a whole there can be no doubt that it is direct and certain as to the offense charged, namely, confederating and banding together to intimidate and alarm Pit Nicholson.

It is contended by appellants, however, that since the so-called accusatory part of the indictment alleged a confederating and banding together to intimidate and alarm and since the so-called descriptive part alleged that they confederated and banded together *and went forth armed* to intimidate Pit Nicholson, they had no way of knowing whether they were charged with the crime denounced by Section 1241a-1 or with the misdemeanor denounced by Section 1223, that of confederating and banding together and going forth armed or disguised for the purpose of intimidating or alarming any person. There is no merit in this contention since it is obvious that Section 1241a-1 repealed Section 1223 by implication. See Com. v. Hightower, 149 Ky. 563, 149 S. W. 971. We conclude that the indictment was sufficient and that the artless manner in which it was drawn was not prejudicial to appellants' substantial rights.

The next ground urged for reversal is that the evi-

dence was insufficient to sustain the conviction. This necessitates a brief statement of the evidence. For the Commonwealth the evidence, furnished by Pit Nicholson and his wife and two children, discloses the following state of facts. About 3 o'clock in the afternoon of the crime Nicholson had fired his shotgun to scare some boys out of his watermelon patch. About 5 o'clock in the afternoon the appellants came to the Nicholson home where Nicholson and his wife and four children were sitting on the porch. This porch was about 15 feet from his fence which was a post and wire fence, the posts being about 8 to 12 inches in diameter and about 3 feet high. The appellants did not speak or extend greetings to the Nicholson family according to the community custom when they came up and each of them "took a post," that is, stationed themselves behind a fence post. One of the appellants had in his possession a high powered rifle. James Maggard opened the conversation by asking Nicholson whom he had shot in his watermelon patch and Nicholson laughingly replied, "Nobody." Thereupon Maggard began cursing him, finally taking his pistol out of his shirt. Nicholson requested them to leave and Mrs. Nicholson went out in the yard and begged the other appellants to get James Maggard away but they refused to do so or to make any answer to her entreaties. James Maggard informed Nicholson during the course of his abusive language that he had been talking too much and had better stay away from Manchester. Russell Maggard took the rifle from James Maggard and set it down by a post and thereupon James Maggard said to his brother: "God damn you, you are staying with me like you said you would," and Russell replied that he was. James Maggard finally drew his pistol and when Nicholson saw this he started from the porch to go around the corner of the house and his wife got between him and appellants. As Nicholson went around the house James Maggard fired at him and Nicholson then ran from home to the home of his brother, Shell Nicholson. Mrs. Nicholson and the children ran down the road screaming and begging for help. During the entire time the appellants were at the Nicholson home none of them except James Maggard did or said anything with the exception of the one remark referred to made by Russell Maggard to James.

The appellants' version of the difficulty is that they had been digging potatoes near the Nicholson home and

with them were two women, Nannie Maggard and Sallie Lewis. They finished their work and started home, stopping at the home of a neighbor, while the two women went a different way and later came to the home where appellants were assembled and informed them that they had heard Pit Nicholson tell Shell Nicholson that he had shot some boys in his watermelon patch; that he had one of them down and thought he had another and was going around the woods to cut off the other two and get them. The boys whom the women reported to appellants had been shot were related to some of the appellants. The appellants thereupon started to the Nicholson home to see about the wounded boys and get them home. Roy Fields had left appellants and gone squirrel hunting with a .22 rifle and on the way to Nicholson's home they met up with him and he accompanied them— this was the only rifle they had. When they reached the Nicholson home James Maggard asked Nicholson whom he had shot in the watermelon patch and Nicholson started cursing them and told them it was nobody's business. James Maggard informed Nicholson that they wanted to get the boys who had been shot and Nicholson, pointing to the gate that led into the watermelon patch, said that the first man that went through that gate would get what the boys got. After considerable cursing Nicholson drew his pistol and shot at James Maggard and the appellants then left the Nicholson home.

The jury, of course, had a right to accept either version of the difficulty and to believe or disbelieve either set of witnesses and they chose to accept the version given by the Nicholson family. Accepting this testimony as true, and we may say that it has more the ring of truth than the testimony of appellants, it is clear that the evidence was sufficient to sustain the verdict. While there was no direct evidence of a confederating and banding together to intimidate Nicholson the conduct of the appellants as related by members of the Nicholson family was sufficient for the jury to indulge the inference that the appellants had confederated and banded together for this purpose. Their manner and conduct, especially their action in getting behind fence posts, indicated clearly that they were motivated by a sinister purpose. It is nearly always impossible to prove a confederating and banding together by direct evidence but this is not necessary as the acts and conduct of the defendants may indicate such a confederating and band-

ing together as clearly as direct testimony to that effect. We think the evidence here was sufficient to establish the conspiracy.

The next ground urged for reversal is that the trial court erred in excluding competent evidence offered by appellants in several instances. The first instance complained of is the refusal to permit a witness to testify that he heard Pit Nicholson tell Shell Nicholson that he had shot two boys in the watermelon patch and that the two women, Nannie Maggard and Sallie Lewis, who reported the shooting to appellants, heard Pit Nicholson make this statement. Assuming, however, that this testimony was competent, we see nothing in the court's ruling prejudicial to appellants' substantial rights since these women and the appellants were permitted to testify that this information was communicated to appellants by the women and the jury could have had no doubt that the appellants went to the Nicholson home in connection with and on account of the reported shooting. This being true it was comparatively immaterial whether or not the women had actually heard Pit Nicholson make the statement.

One of the appellants, A. C. Howard, was asked if he did not state to Pit Nicholson a short while before the trial that the rifle they had with them was a 30-30 rifle belonging to Sebree Fields and that he had had it in his hands a thousand times. He denied making this statement and Nicholson was thereupon re-called to the witness stand and testified that the statement was made. Nicholson also testified as to a contradictory statement made by James Maggard. At the conclusion of the evidence in rebuttal the court admonished the jury that evidence of these contradictory statements could not be considered as substantive evidence as to the guilt of the defendants, A. C. Howard and James Maggard, but that they might consider it for whatever bearing it had upon the credibility of *the defendants* as witnesses. It is urged that this admonition was fatally defective in that the jury should have been admonished that these contradictory statements were not competent against any of the defendants except A. C. Howard and James Maggard. In this, we think, there is little merit since there is little doubt that the jury understood that such evidence could only be accepted as affecting the credibility of the particular defendants who made the statements.

Certainly it does not appear that the failure of the court to particularize the admonition in the respect mentioned is sufficient to warrant a reversal of the judgment.

The final contention is that the trial court, by the instructions authorized the jury to convict any one of the defendants while, obviously, one man could not by himself confederate and band together. We do not think the instruction is misleading or subject to the vice ascribed to it by appellants. Under the first instruction we think it is fairly clear that the jury must have understood that they could convict only if two or more of the appellants confederated and banded together as charged in the indictment. In any event, when the second instruction defining confederating and banding together is considered it is perfectly apparent that the jury could not have misunderstood the purport of instruction No. 1. The second instruction correctly defined confederating and banding together as a corrupt combination and agreement between two or more persons to do by concerted action an unlawful act or to do a lawful act by unlawful means. Considering the instructions as a whole we think there was no probability that the jury could have been misled.

Our consideration of the record as a whole convinces us that the appellants had a fair and impartial trial free from any error prejudicial to their substantial rights and that the evidence was sufficient to sustain the verdict.

Judgment affirmed.

Whole court sitting.